UNITED STATES of America, Plaintiff,

v.

Jose Antonio RIVAS–LOPEZ, Defendant.

No. 2:97–CR–104.

United States District Court,
D. Utah,
Central Division.

Dec. 31, 1997.

---

6. See FN. 2, *Supra.*

Leshia M. Lee–Dixon, Assistant U.S. Attorney, Salt Lake City, UT, for U.S.

Morna Bowman Rouse, Park City, UT, for Defendant.

## MEMORANDUM DECISION and ORDER

J. THOMAS GREENE, Senior District Judge.

This matter is before the court on numerous motions by defendant. The government is represented by Leshia M. Lee–Dixon, Assistant United States Attorney. Defendant is represented by Morna Bowman Rouse. An evidentiary hearing was held on July 29, 1997, after which the Safe Streets Coalition, et al., represented by Paul G. Cassell, was given permission by the court to file an Amicus Curiae brief on the issue of the applicability of 18 U.S.C. § 3501 to defendant's motion to suppress statements, which has been responded to by the parties. Being fully advised, the court now enters its memorandum decision and order.

### FACTS

On March 19, 1997, at around 1:50 p.m. defendant Rivas–Lopez was stopped by Utah Highway Patrol Trooper Paul Mangelson while traveling north on Interstate 15, south of Nephi. Defendant is a twenty year old Hispanic male. Trooper Mangelson, using his radar gun, determined that defendant was traveling 80 mph in a 75 mph zone and also noticed that the front license plate was missing. As Trooper Mangelson approached the vehicle he also noticed that the rear tail light was broken. Mangelson requested defendant's driver license and registration. While defendant was retrieving these documents from the glove box, Mangelson noticed a pager on the visor, a Philips screw driver in the glove box, and used tissues and white particles on the driver's seat. He suspected defendant of using cocaine or methamphetamine and asked defendant whether he was using drugs, referring to the white particles. Defendant responded that the particles were frosting from pastry.

Based on probable cause, Mangelson performed a pat-down search of defendant for his own protection, and then made a cursory search of the front seat of the vehicle for weapons. None were found, but Mangelson asked defendant to accompany him to the patrol vehicle while he ran a records check and wrote a warning notice. While writing the notice, Mangelson asked defendant where he was traveling, who he was seeing and asked about addresses and phone numbers. Defendant indicated that he was traveling to Salt Lake City to visit his uncle, Jose Julian Lopez, and to look for work. However, defendant could not give an address or telephone number for his uncle. Defendant said that his uncle lived at "600 West or something." Following the background check, defendant's registration, license, and other paperwork were returned to him. Mangelson then asked defendant if he could continue to search the vehicle. Defendant responded "ok," and filled out a consent form, which was read to him and signed by him.

At this point, Trooper Charlie Wilson arrived and helped Mangelson search defendant's vehicle. Two packages wrapped in cellophane wrap were found in the rear quarter panels. Based on his considerable past experience, Trooper Mangelson recognized the packages as probably containing methamphetamine. Later, both packages tested positive for methamphetamine. Defendant was arrested and advised of his *Miranda* rights. He acknowledged that he understood those rights and that he didn't want to waive his rights at that time, so no further questioning then occurred. Mangelson took photographs and conducted a preliminary inventory of the vehicle. Defendant was then transported to the Juab County Sheriff's office in Nephi, where Sergeant Ellis and Trooper Mangelson interviewed defendant. Prior to any questioning, defendant again received his *Miranda* warnings and at that time would not waive his rights. Sgt. Ellis then asked whether defendant would answer questions "out of Miranda." Trooper Mangelson testified at the evidentiary hearing that "out of Miranda" meant that the witness would be responding to questions as if the *Miranda* warnings had never been given and that the defendant was so advised. On that

basis, defendant agreed to talk. He said that he had been paid $1000 to drive the methamphetamine to Salt Lake City, but that he would not help the police make a delivery because he feared for his life from the people for whom and to whom he was delivering the drugs.[1]

## ANALYSIS

### 1. Defendant's Motions to Dismiss and Motions to Suppress

#### Motion to Dismiss for Unnecessary Delay

■ Defendant moves the court to dismiss the indictment under Rule 48(b) of the Rules of Criminal Procedure. That Rule provides that if there is "unnecessary delay" in presenting a charge to a grand jury or in filing an information against defendant "who has been held to answer to the district court," the court "may" dismiss the indictment, information or complaint. In this case, defendant was not in federal custody during the period of delay, but was in the custody of state officials for a number of days. Although the state officials may have contacted the U.S. Attorney's office following arrest, this does not bestow federal jurisdiction and custody over the defendant for Rule 48 purposes. Accordingly, the motion to dismiss under Rule 48(a) is not well taken.

#### Motion to Suppress for Failure to be timely brought before the Magistrate

■ Defendant moves the court to suppress under Federal Rule of Criminal Procedure 5(a) because he was not timely brought before a magistrate.[2] Rule 5(a) provides that

---

1. The hearing transcript of Trooper Mangelson's testimony is as follows:

[following defendant's arrest and first reading of his *Miranda* rights...]

Q. Once you arrived [at the Sheriff's office in Nephi] then, did you have a further conversation with Mr. Rivas–Lopez?

A. Yes. A little later date a narcotics officer by the name of John Ellis was contacted and he responded to the sheriff's office in Nephi, and the two of us conducted an interview with him.

Q. Was that the same day or—

A. The same day. Probably an hour and a half later, somewhere around that. Sergeant Ellis had to drive from Richfield to our area.

Q. And during the course of that interview was Mr. Rivas–Lopez given his rights again?

A. Yes.

Q. Do you recall who did that?

A. I believe that Sergeant Ellis advised him of his rights at that time.

Q. You were present the entire time?

A. Yes.

. . . .

Q. And did Mr. Rivas–Lopez indicate that he understood his rights?

A. He did.

Q. And at that point in time did he agree—or did he waive his right to an attorney?

A. He would not waive his rights.

Q. Do you recall exactly what he said?

A. Sergeant Ellis said—he told him his rights. Asked him if he would like to talk to us about the narcotics, where it was going, who it was going to. And he said he didn't want to waive his rights, that if he talked that he feared for his life, and he didn't want to talk to us. He would not waive his rights.

Q. Now subsequent to that, did he make any other statement?

A. Yes.

Q. And were they the response to any questioning by yourself?

A. He was asked, and I believe that Sergeant Ellis asked this question also, he was leading the interview at that point, he asked Mr. Rivas–Lopez if he would like to talk to us off—out of the Miranda.

Q. And what does that mean, out of Miranda?

A. What it means to me is that whatever he's telling us, he's telling us the same as not being advised of Miranda.

Q. And did he make any statements or did he agree?

A. He did.

Q. What did he say?

A. About the only statement he made is that he had been paid a thousand dollars to drive this methamphetamine to Salt Lake. And he would not help us make a delivery, he would not do anything like that for the fear that he had of these individuals. He was afraid they would kill him.

Q. At this point did all conversations with Mr. Rivas–Lopez cease?

A. Yes.

2. As to what the Supreme Court deems "timely," see, *Riverside v. McLaughlin,* 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991), in which the Supreme Court held that a jurisdiction that chooses to combine probable cause determinations with other pretrial proceedings must do so as soon as is reasonably feasible, but not later than 48 hours.

after an arrest, the person making the arrest shall take the arrested person "without unnecessary delay" before the nearest available magistrate judge, of if the nearest magistrate is not "reasonably available," to an authorized state or local judicial officer. The judicial officer then is required to determine whether the probable cause requirements of Rule 4(a) have been met. Rule 5(a) attaches only after the accused is taken into federal custody. *Hayes v. United States,* 419 F.2d 1364, 1367–68 (10th Cir.1969); *cert. denied,* 398 U.S. 941, 90 S.Ct. 1856, 26 L.Ed.2d 276 (1970). Here, defendant was in the custody of state police until the Indictment and warrants were issued. There was no showing by defendant that the state and federal officers were working together to circumvent Rule 5(a). *See Anderson v. United States,* 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. 829 (1943); *United States v. Rose,* 415 F.2d 742, 743 (6th Cir.), *cert. denied,* 396 U.S. 971, 90 S.Ct. 458, 24 L.Ed.2d 438 (1969). Therefore, there was no Rule 5(a) violation.

*Motion to Dismiss due to destruction of evidence*

 Defendant has moved the court to dismiss the Indictment because of destruction of evidence, namely, that the car was sold. Defendant argues that this prejudices him because he does not now have the opportunity to inspect the vehicle or to view the compartment where the drugs were found. The duty of the government to preserve evidence is limited to what might be expected to play a significant role in the defendant's defense. *See California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). To be constitutionally material, evidence must: (1) possess an exculpatory value that was apparent before the evidence was destroyed, and (2) be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. *Id.* 467 U.S. at 488–89, 104 S.Ct. at 2534. The court has viewed photographs of the vehicle in this case which were admitted into evidence. These photographs clearly show the lack of a front license plate, and a broken tail light. ·The vehicle itself would not have been sufficient to exculpate this defendant. Therefore, the lack of this evidence does not rise to the level mandating dismissal of the Indictment under the *Trombetta* test.

*Motion to Strike Officer's statements concerning speed by use of radar gun*

 Defendant moves the court to strike Sgt. Mangelson's testimony regarding the speed of the vehicle, contending that no proper foundation was laid regarding the operation of the radar gun. This court finds that the officer did have probable cause to believe defendant was exceeding the speed limit by reason of the reading he noted in operation of his radar gun. The officer testified that he had operated the radar gun since it was new, and that he tested it and calibrated it on the day the incident occurred. Viewed objectively, Mangelson had probable cause to believe a traffic violation was occurring and lawfully stopped the vehicle. *United States v. Botero–Ospina,* 71 F.3d 783, 787 (10th Cir.1995) (If the stop is based on an observed traffic violation, or if the police officer has a reasonable articulable suspicion that a traffic violation has occurred, a vehicle stop is valid.).

*Motion to Suppress secondary evidence concerning vehicle defects*

Defendant moves the court to suppress all secondary evidence regarding the vehicle, including photographs and Mangelson's testimony regarding the vehicle's defects. This court finds that the photographs adequately show the vehicle and areas where the drugs were found, and adequately show the defects in the vehicle. The motion to suppress in this regard is without merit.

*Motion to Suppress all evidence because of no valid consent to search*

 Defendant moves the court to suppress all the evidence because there was no valid consent to search the vehicle. Defendant contends that the officer did not inform defendant that he was free to go prior to seeking his consent to search the car. However, it is unnecessary that the officer specifically inform a defendant that he is free to go. *See Ohio v. Robinette,* —— U.S. ——, ——, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996). Defendant's driver's license, registration, warning citation, and all other paperwork

had been returned to him prior to obtaining consent to search. In all other respects, the consent was voluntary and consensual.

*Motion to Suppress because of unlawful detention*

■ Finally, defendant moves the court to suppress evidence gained from unlawful detention. He argues that the questions about where he was going, what he was doing, etc., during the background check, went beyond the scope of the stop. However, routine questions about travel plans may be asked without exceeding the scope of a traffic stop. *United States v. Hernandez*, 93 F.3d 1493 (10th Cir.1996). Also, no unlawful detention occurred in this case which would warrant exclusion of evidence. The officer performed a permissible and appropriate pat-down, and cursory search of the vehicle for personal safety.

### 2. Motion to Suppress the "off Miranda" statements

Defendant moves the court to suppress his statements made "off Miranda." In determining whether those statements are admissible, this court must determine whether the standards under the *Miranda* decision [3] or the requirements of 18 U.S.C. § 3501 [4] control as related to protection of rights under the Fifth Amendment.

The underlying issue is whether *Miranda* establishes a constitutional rule or merely sets forth "prophylactic" standards with regard to interpretation of the Fifth Amendment's restrictions against self incrimination. In the latter, Congress would be free to legislate different rules while still protecting core Fifth Amendment rights. The government argues that the *Miranda* warnings are constitutionally required and therefore will

3. See *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). See footnote 5, *infra*.

4. § 3501. Admissibility of Confessions.

(a) In any criminal prosecution brought by the United States or by the District of Columbia, a confession, as defined in subsection (e) hereof, shall be admissible in evidence if it is voluntarily given. Before such confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness. If the trial judge determines that the confession was voluntarily made it shall be admitted in evidence and the trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances.

(b) The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession. The presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession.

(c) In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate or other officer empowered to commit persons charged with offenses against the laws of the United States or of the District of Columbia if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention: Provided, That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate or other officer.

(d) Nothing contained in this section shall bar the admission in evidence of any confession made or given voluntarily by any person to any other person without interrogation by anyone, or at any time at which the person who made or gave such confession was not under arrest or other detention.

(e) As used in this section, the term "confession" means any confession of guilt of any criminal offense or any self-incriminating statement made or given orally or in writing.

not urge the lower courts to disregard that rule in favor of a contrary rule established by Congress. Thus, the government takes the curious position in agreement with defendant that § 3501 does not apply and is unconstitutional. The court's *amici* argues that *Miranda* only established prophylactic suggestions, and that § 3501 is constitutional and controls the voluntariness analysis and the admissibility of the statements.

### 3. The Prophylactic Rather than Constitutional Nature of the Miranda Warnings

In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court announced a new analytical approach under the Self–Incrimination Clause of the Fifth Amendment in cases involving custodial interrogation. *Miranda* held that no statements stemming from custodial interrogation of a suspect would be admissible unless the police first provided four "warnings." [5] The Supreme Court acknowledged that the Constitution requires no "particular solution for the inherent compulsions of the interrogation process," [6] and left open the opportunity for Congress and the States to "develop their own safeguards for the privilege, so long as they are fully as effective as [the four warnings] in informing accused persons of their right of silence and in affording a continuous opportunity to exercise it." *Id.* at 490, 86 S.Ct. at 1636. The court held, notwithstanding, that unless the alternative procedures were equally as effective, the warning "safeguards must be observed." *Id.* at 467, 86 S.Ct. at 1624.

Two years later, Congress enacted 18 U.S.C. § 3501. Section 3501(a) provides that "in any criminal prosecution brought by the United States," a confession "shall be admissible in evidence if it is voluntarily given." The statute requires trial judges to make a threshold determination of voluntariness outside the presence of the jury, and provides that voluntariness shall be assessed based on the totality of the circumstances—including whether or not the "defendant was advised

or knew that he was not required to make any statement and that any such statement could be used against him," and whether the defendant had been advised of his right to counsel. 18 U.S.C. . 3501(b). However, § 3501(b) also states that the "presence or absence" of any particular factor "need not be conclusive on the issue of voluntariness of the confession." Congress intended to reject the *Miranda* warning requirements and to restore the pre–*Miranda* voluntariness analysis. *See* S.Rep. No. 1097, 90th Cong., 2d Sess. (1968), *reprinted in* U.S.Code Cong. & Admin. News 1968, 2112, 2124–2138. Senate opponents recognized that Sections 3501(a) and (b), by making voluntariness the sole criterion for the admissibility of confessions, "squarely [were] in conflict with" *Miranda. Id.* at 2210–11. Both proponents and opponents of the House of Representatives noted that the legislation rejected *Miranda. See,* e.g., 114 Cong. Rec. 16,066 (1968)(remarks of Rep. Celler); *id.* at 16,074 (Rep. Corman); *id.* at 16,278 (Rep. Poff); *id.* at 16,279 (Rep. Taylor); *id.* at 16,296 (Rep. Randall); *id.* at 16,297–98 (Rep. Pollock).

■ It is clear that Congress has the power to supersede judicially created rules of procedure and evidence that are not required by the constitution. *Cf. Palermo v. United States,* 360 U.S. 343, 353 n. 11, 79 S.Ct. 1217, 1225 n. 11, 3 L.Ed.2d 1287 (1959). Congress may not, however, alter the substance of the Supreme Court's constitutional interpretations by legislation. *See City of Boerne v. Flores,* —— U.S. ——, ——, 117 S.Ct. 2157, 2163–64, 138 L.Ed.2d 624 (1997) (invalidating the Religious Freedom Restoration Act). The validity of Sections 3501(a) and (b) therefore depends upon whether *Miranda* imposes constitutional requirements or is an exercise of the Supreme Court's supervisory powers over the administration of criminal justice in the federal courts.

■ The government argues that the *Miranda* court clearly based its holding on the constitution in stating that "[u]nless adequate

---

5. The four well-known warnings are: (1) that the suspect has the right to remain silent; (2) that any statements he makes can be used against him; (3) that he has the right to the presence of an attorney during questioning; and (4) that an

attorney will be appointed for him if he cannot afford one. *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612.

6. *Miranda,* 384 U.S. at 467, 86 S.Ct. at 1624.

protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice." *Miranda,* 384 U.S. at 458, 86 S.Ct. at 1619. As a factual foundation for this conclusion, the court found that the "process of in-custody interrogation," as the court understood it, "contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Id.* at 467, 86 S.Ct. at 1624. While the *Miranda* court found that the privilege against self incrimination was always violated unless police officers take effective measures to dispel the compulsion attendant in custodial interrogation, the Supreme Court has since retreated from a strict requirement for admissibility that each of the four *Miranda* warnings be given. In this regard, the Court has acknowledged that the post-*Miranda* decisions have "lessen[ed] the desirable clarity of that rule." *New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984).[7] Justice O'Connor writes,

> [w]hether the mere failure to administer Miranda warnings can 'taint' subsequent admissions is an open question, compare *United States v. Toral,* 536 F.2d 893, 896–897 (C.A.9 1976), with *Oregon v. Elstad,* 61 Or.App. 673, 658 P.2d 552 (1983), cert. granted, 465 U.S. 1078, 104 S.Ct. 1437, 79 L.Ed.2d 759 (1984), but a proper inquiry must focus at least initially, if not exclusively, on whether the subsequent confession is itself free of actual coercion.

*Id.* at 660 n. 1, 104 S.Ct. at 2634 n. 1 (J. O'Connor concurring in the judgment and dissenting in part).[8]

In a line of cases beginning with *Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974), the court held that a violation of *Miranda*'s rules is not per se a constitutional violation; that is, a statement is not necessarily "compelled" in violation of

the Fifth Amendment privilege simply because it is unwarned. In *Tucker,* a suspect who had received incomplete *Miranda* warnings gave a statement naming a witness who later incriminated the suspect at trial. The court held that suppression of the witness' testimony was not required under the "fruit of the poisonous tree" doctrine, because the police conduct at issue "involved no compulsion sufficient to breach the right against compulsory self-incrimination[,] ... but departed only from the *prophylactic standards* later laid down by this Court in *Miranda* to safeguard that privilege." *Tucker,* 417 U.S. at 445–46, 94 S.Ct. at 2364–65 (Emphasis added). Citing *Miranda*'s statement that the Constitution does not "necessarily require[] adherence to any particular solution for the inherent compulsions of the interrogation process," *Tucker* concluded that:

> [*Miranda* ] recognized that *these procedural safeguards were not themselves rights protected by the Constitution* but were instead measures to insure that the right against compulsory self-incrimination was protected.... The *suggested safeguards* were not intended to 'create a constitutional straitjacket,' ... but rather to provide practical reinforcement for the right against compulsory self-incrimination. A comparison of the facts in this case with the historical circumstances underlying the privilege against compulsory self-incrimination strongly indicates that the police conduct here did not deprive respondent of his privilege against compulsory self-incrimination as such, but rather failed to make available to him the full measure of *procedural safeguards* associated with that right since *Miranda.* Certainly no one could contend that the interrogation faced by respondent bore any resemblance to the historical practices at which the right against compulsory self-incrimination was aimed.

**7.** The Supreme Court has recognized the trade-off between the virtues of bright-line rules under *Miranda* and *Edwards* and risking suppression of evidence otherwise not in violation of the Fifth Amendment:

> This gain in specificity ... has been thought to outweigh the burdens that the decision in Miranda imposes on law enforcement agencies and the courts by requiring the suppression of

trustworthy and highly probative evidence even though the confession might be voluntary under traditional Fifth Amendment analysis. *Arizona v. Roberson,* 486 U.S. 675, 681–82, 108 S.Ct. 2093, 2098, 100 L.Ed.2d 704 (1988).

**8.** The Supreme Court's holding and analysis in *Oregon v. Elstad* is discussed herein, *supra.*

*Id.* at 444, 94 S.Ct. at 2364 (Emphasis added). Since *Tucker,* the Supreme Court has frequently characterized the *Miranda* rules as "prophylactic" and that an unwarned statement is not necessarily "compelled" in violation of the Fifth Amendment. *See, e.g., Davis v. United States,* 512 U.S. 452, 457–58, 114 S.Ct. 2350, 2354–55, 129 L.Ed.2d 362 (1994); *Duckworth v. Eagan,* 492 U.S. 195, 203, 109 S.Ct. 2875, 2880, 106 L.Ed.2d 166 (1989); *Connecticut v. Barrett,* 479 U.S. 523, 528, 107 S.Ct. 828, 831, 93 L.Ed.2d 920 (1987). The Court in *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), stated that:

> The Miranda exclusionary rule, however, serves the Fifth Amendment and *sweeps more broadly than the Fifth Amendment itself.* It may be triggered even in the absence of a Fifth Amendment violation. The Fifth Amendment prohibits use by the prosecution in its case in chief only of *compelled* testimony. Failure to administer Miranda warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under Miranda. Thus, in the individual case, Miranda's preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm.
>
> But the Miranda presumption, though irrebuttable for purposes of the prosecution's case in chief, *does not require that the statements and their fruits be discarded as inherently tainted.* Despite the fact that patently voluntary statements taken in violation of Miranda must be excluded from the prosecution's case, the presumption of coercion does not bar their use for impeachment purposes on cross-examination.

*Id.* at 306–07, 105 S.Ct. at 1291–92 (footnotes and citations omitted; emphasis in original; emphasis added). Furthermore, the Court concluded that the admissibility of a state-ment should turn solely on whether it is "knowingly and voluntarily made." *Id.* at 309, 105 S.Ct. at 1293.[9]

Notwithstanding this line of authority, the Department of Justice argues that the most important indication that the Supreme Court does not regard *Miranda* as resting on its supervisory powers is the fact that the court continues to apply the *Miranda* rules to cases arising in state courts. *See, e.g., Stansbury v. California,* 511 U.S. 318, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994)(per curiam); *Minnick v. Mississippi,* 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990); *Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988); *Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986). The Supreme Court's authority over the state court's is limited to "enforcing the commands of the United States Constitution." *Mu'Min v. Virginia,* 500 U.S. 415, 422, 111 S.Ct. 1899, 1903, 114 L.Ed.2d 493 (1991).

In *Stansbury v. California,* defendant Stansbury was convicted of first degree murder, rape, kidnaping and lewd acts against a child and was sentenced to death. Following the murder, Stansbury was brought to the police station and questioned as a witness, not a suspect. He was not issued his *Miranda* warnings until he described the car he was driving the night of the murder, which aroused the suspicion of the officer. When Stansbury admitted prior convictions for rape, kidnaping and child molestation, the officer terminated the interview and Stansbury received his *Miranda* warnings. The trial court denied a motion to suppress the statements made at the station and all evidence discovered therefrom. It determined that Stansbury was not "in custody" and thus not entitled to *Miranda* warnings. The California Supreme Court affirmed. *Stansbury,* 511 U.S. at 319–21, 114 S.Ct. at 1527–28. The issue before the Supreme Court was whether Stansbury was "in custody" for *Miranda* purposes. Following its analysis, the

---

9. In *New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), the Supreme Court expressed the view that an unwarned statement is not necessarily an unconstitutionally "compelled" statement. There, the court recognized a "public safety" exception to the requirement of *Miranda* warnings and held that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the *prophylactic rule* protecting the Fifth Amendment's privilege against self-incrimination." *Id.* at 657, 104 S.Ct. at 2632 (Emphasis added).

Supreme Court reversed and remanded the case for that determination in light of its opinion. *Id.* at 326–27, 114 S.Ct. at 1531. There is no discussion in *Stansbury* about whether the *Miranda* warnings themselves are constitutional commands or evidentiary rules established by the Supreme Court.

In *Minnick v. Mississippi,* defendant Minnick was convicted of two counts of capital murder and he appealed. The interrogation by federal law enforcement officials ended when Minnick requested counsel, and subsequently communicated with an appointed attorney on several occasions. Interrogation was reinitiated without counsel by a county sheriff after Minnick was told that he could not refuse to talk to the sheriff, and Minnick confessed. The motion to suppress was denied, and he was convicted and sentenced to death. The Supreme Court of Mississippi affirmed, finding that the *Edwards* rule,[10] which established a bar against interrogation of the accused without counsel present after a request for counsel has been made, was not violated because counsel had been made available to Minnick. *Minnick,* 498 U.S. at 149–50, 111 S.Ct. at 489. The Supreme Court reversed, holding that the Fifth Amendment protection under *Edwards* is not terminated or suspended by consultation with counsel. *Id.* at 150, 111 S.Ct. at 489. The majority in *Minnick* did not respond to the constitutional arguments of Justice Scalia, who, joined by Chief Justice Rehnquist, dissented:

> Today's extension of the *Edwards* prohibition is the latest stage of prophylaxis built upon prophylaxis, producing a veritable fairyland castle of imagined constitutional restriction upon law enforcement. This newest tower, according to the Court, is needed to avoid "inconsisten[cy] with [the] purpose" of *Edwards'* prophylactic rule,

ante, at 491, which was needed to protect Miranda's prophylactic right to have counsel present, which was needed to protect the right against compelled self-incrimination found (at last!) in the Constitution. *Id.* at 166, 111 S.Ct. at 497 (Justice Scalia, dissenting). Justice Scalia also said that this "protective enterprise is beyond our authority under the Fifth Amendment or any other provision of the Constitution." *Id.* at 166, 111 S.Ct. at 498 (Justice Scalia, dissenting).

In *Arizona v. Roberson,* defendant Roberson was arrested for burglary, and following his *Miranda* warnings, requested counsel. He was interrogated a second time, without counsel present, concerning an unrelated burglary in which he made incriminating statements concerning the charged burglary. The statements were suppressed by the trial court and the court of appeals affirmed. The Supreme Court affirmed, holding that the *Edwards* rule applies when a police-initiated interrogation following a suspect's request for counsel occurs in the context of a separate investigation. 486 U.S. at 677–78, 108 S.Ct. at 2096. Regarding the issue of whether the *Miranda* warnings are constitutional commands, the Supreme Court characterized the warnings as "prophylactic protections" which "counteract the 'inherently compelling pressures' of custodial interrogation and to 'permit a full opportunity to exercise the privilege against self-incrimination.' " *Id.* at 680–81, 108 S.Ct. at 2097. Writing for dissenting Justices Kennedy and Rehnquist, Justice Kennedy stated that the "rule of *Edwards* is our rule, not a constitutional command;" *Id.* at 688, 108 S.Ct. at 2101–02 (Justice Kennedy, dissenting). He warns that

> balance is essential when the Court fashions rules which are preventative and do not themselves stem from violations of a

**10.** The *Edwards* rule is that a suspect who expresses a desire to deal with the police only through counsel is not subject to further interrogation until counsel has been made available to him, unless the suspect initiates the further communication with police. *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981). This rule was expanded in *Minnick v. Mississippi* also to include that after a suspect has been provided counsel, any reinitiation of interrogation which the accused is compelled to attend without counsel is impermissible. Defendant argues that § 3501 is un-

constitutional and that it does not "trump" the *Edwards* rule. *See United States v. Cheely,* 36 F.3d 1439 (9th Cir.1994)(§ 3501 does not trump *Edwards,* therefore defendant's statements were unconstitutionally elicited after he had invoked his right to counsel and it is thus irrelevant that his subsequent incriminating statements were voluntary.). The *Edwards* analysis is irrelevant based on the evidence presently before the court because Trooper Mangelson never testified that defendant ever specifically requested to deal with the police only through counsel.

constitutional right. *Michigan v. Tucker,* 417 U.S. 433, 444, 94 S.Ct. 2357, 2363–2364, 41 L.Ed.2d 182 (1974). By contrast with the Fourth Amendment exclusionary rule, for instance, the rule here operates even absent constitutional violation, see *Oregon v. Elstad....*

*Id.* at 691, 108 S.Ct. at 2103 (Justice Kennedy, dissenting).

Finally, in *Michigan v. Jackson,* defendant Jackson was convicted of second-degree murder. At arraignment, Jackson had requested appointment of counsel. Before having the opportunity to consult with counsel, and after advising defendant of his *Miranda* rights, police officers questioned Jackson and obtained a confession. Upon review, the Michigan Supreme Court held that post-arraignment confessions were improperly obtained in violation of the *Sixth* Amendment. On certiorari, the Supreme Court applied the *Edwards* decision, a *Fifth* Amendment decision, to affirm the Michigan Supreme Court's ruling, holding that "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." *Id.* at 636, 106 S.Ct. at 1411. Again, as to whether *Miranda* imposes constitutional commands, Justice Rehnquist, joined by Justice Powell and O'Connor in dissent, argued that the Court chose to ignore or forgot that the constitutional guarantee under the Fifth Amendment is the

prohibition on compelled self-incrimination. This prohibition, of course, is also the constitutional underpinnings for the set for prophylactic rules announced in Miranda itself.... Seen in this proper light, *Edwards* provides nothing more than a second layer of protection, in addition to those rights conferred by Miranda, for a defendant who might otherwise be compelled by the police to incriminate himself in violation of the Fifth Amendment.

*Id.* at 638–39, 106 S.Ct. at 1412 (Justice Rehnquist, dissenting).

In light of the foregoing analysis of the cases in which *Miranda* and *Edwards* rights have been applied to the states by the Supreme Court, notwithstanding the challenges of the various dissenting opinions above, the majority of the court has never specifically articulated that the "prophylactic" *Miranda* warnings have constitutional stature. Rather, the court continues to characterize them as prophylactic, and has not retreated from its conclusion in *Michigan v. Tucker* and *Oregon v. Elstad* that the constitutional right in question is the privilege against compulsory self-incrimination, and that the suggested prophylactic standards laid down in *Miranda* are not in and of themselves constitutional rights, but are safeguards of that privilege.

Based on the foregoing analysis, this court is unpersuaded by the contention of the government and the defendant in this case that the Supreme Court regards the prophylactic rules of *Miranda* and *Edwards* as constitutionally mandated. Of course, whether the Supreme Court has inappropriately imposed extra-constitutional requirements on the states in the opinions cited by the government is not for this court to decide. Therefore, the government's contention that the Supreme Court's continued application of the *Miranda* exclusionary rule in state cases is founded upon the conclusion that the *Miranda* warnings are constitutional requirements is rejected. Because no Supreme Court case dictates otherwise, the court now turns to controlling Tenth Circuit law.

### 4. The Constitutionality of 18 U.S.C. § 3501—Tenth Circuit Law

In *United States v. Crocker,* 510 F.2d 1129 (10th Cir.1975), the Tenth Circuit held that *Tucker, supra,* in effect did adopt and uphold the constitutionality of § 3501. *Crocker* is the only federal appellate case to expressly consider the issue of the impact of *Tucker* on the validity of § 3501. The government downplayed this decision as "without extended analysis" and unpersuasive because it was decided less than a year after the *Tucker* case, and the Tenth Circuit since then has not had the occasion to reexamine *Crocker* in light of the Supreme Court's subsequent *Miranda* jurisprudence discussed herein.[11]

---

11. The government's arguments were articulated in a supplemental brief filed with the Fourth

Circuit in *United States of America v. Tony Leong,*

In *Crocker*, Barbara Crocker was found guilty of conspiracy with intent to defraud the United States, willfully and unlawfully and knowingly, by concealing and falsely making forged and counterfeit $10.00 Federal Reserve Notes, and that passing one of said notes in Oklahoma City. In the morning of her arrest, Crocker had been presented a written *Miranda* "rights" document which she read and signed, and was orally interrogated by two agents. Later that afternoon, she was again presented with a *Miranda* "rights" document which she signed, and also a statement of confession prepared by an agent, which she signed after she "skimmed" through it. *Id.* at 1131–32. The trial court applied the guidelines of 18 U.S.C. § 3501 rather than the analysis under *Miranda* in its pretrial determination of the voluntariness of her written confession and its admissibility at trial. On appeal, the Tenth Circuit reviewed the legislative history of § 3501, the basic premise of *Miranda*, Tenth Circuit law which favorably cited § 3501, *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), in which the Court began to erode the strictness of requiring each *Miranda* warning as a prerequisite for admitting evidence prior to *Tucker*, and the analysis of the Supreme Court in *Tucker* to conclude that 18 U.S.C. § 3501 is constitutional. *Crocker*, 510 F.2d at 1136–1138. The Tenth Circuit noted that in the *Tucker* case, although Tucker did not receive the *Miranda* warning that he had the right to appointment of counsel if he was indigent, the Supreme Court nevertheless had admitted a witness' testimony gained through the interrogation which otherwise

should have been excluded under *Miranda*. In this regard, the *Crocker* court stated:

> We observe that if each of the *Miranda* warnings are constitutionally mandated under any and all circumstances, certainly the Court would have been hard pressed in permitting the admission of Henderson's testimony under the 'fruit of the poisonous tree' doctrine....

*Id.* at 1137–38. The Tenth Circuit also supported its holding in reference to the statement by the Supreme Court in *Tucker* that the *Miranda* warnings are " 'suggested' safeguards [which] were not intended to 'create a constitutional straitjacket' notwithstanding the language of *Miranda* that statements made in violation of its principles must not be used to prove the prosecutions case at trial." *Id.* at 1137.[12] The Tenth Circuit squarely upheld the constitutionality of 18 U.S.C. § 3501 and concluded: "We believe that *Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974), although not involving the provisions of § 3501, *supra*, did, in effect, adopt and uphold the constitutionality of the provisions thereof." 510 F.2d at 1137.[13]

The government implies that the *Miranda* jurisprudence since the *Crocker* case would undoubtedly persuade this circuit to alter its course if given the chance, but apparently the government does not want to give the Tenth Circuit that chance. Given the above review of the cases and post-*Miranda* decisions, this court declines to so speculate, and will and must follow the precedent set in this circuit. *Crocker* has not been overruled, or even negatively cited. Accordingly, this

---

116 F.3d 1474, 1997 WL 351214 which is attached to its Supplemental Response to Defendant's Motion to Suppress.

**12.** The Tenth Circuit was quoting *Miranda:*

> Our decision in no way creates a constitutional straightjacket which will handicap sound efforts at reform, nor it is intended to have this effect. We encourage Congress and the States to continue their laudable search of increasingly effective ways of protecting the rights of the individual while promoting efficient enforcement of our criminal laws.

> *Miranda*, 384 U.S. at 467, 86 S.Ct. at 1624.

**13.** Later Tenth Circuit cases support the conclusion that *Crocker* remains the law of this circuit.

In *United States v. Fritz*, 580 F.2d 370, 378 (10th Cir.1978) (en banc), the Tenth Circuit rejected a defendant's motion to suppress and stated that the "government met its burden of proof that Fritz voluntarily waived his constitutional privilege against self-incrimination." The court cited both *Crocker* and 18 U.S.C. § 3501 in support of this statement. In *United States v. Shoemaker*, 542 F.2d 561 (10th Cir.), *cert. denied*, 429 U.S. 1004, 97 S.Ct. 537, 50 L.Ed.2d 616 (1976), the Tenth Circuit reaffirmed *Crocker*: "[v]oluntariness is the sole test for admissibility of a confession." *Id.* at 563; *see also United States v. Glover*, 104 F.3d 1570, 1583 (10th Cir.1997) (discussing § 3501(c) and citing *Shoemaker* for the proposition that "voluntariness is the sole test for admissibility of a confession.").

court rules that 18 U.S.C. § 3501 is constitutional and therefore will apply its analysis to determine the admissibility of defendant's statements in this case.

### 5. 18 U.S.C. § 3501 Analysis

█ As previously recited, when defendant was arrested, he was informed of his full *Miranda* rights and he responded that he understood them and did not wish to waive them at that time. Following defendant's arrest he was taken to the Juab County Public safety building in Nephi, Utah. Approximately an hour and a half later, a narcotics officer, Sergeant John Ellis, and Trooper Mangelson conducted an interview with defendant. They again advised him of his rights and defendant again stated that he understood his rights and "would not waive his rights." *See* footnote 1, *supra*. Sergeant Ellis then asked if Mr. Rivas–Lopez would like to talk to them "out of Miranda." Defendant was told that this meant that he could respond as though the officers had not given any *Miranda* warnings. Defendant agreed and made the statement that he had been paid a thousand dollars to drive the vehicle containing methamphetamine to Salt Lake City, but that he would not help the police make a delivery or do anything like that because he feared the individuals to whom he was delivering the drugs and was afraid they would kill him. This was the only evidence concerning the voluntariness presented at the evidentiary hearing.

At the evidentiary hearing, only Trooper Mangelson testified, although it was Sgt. Ellis who interrogated defendant and obtained the statements. Defendant apparently was unprepared to cross-examine Trooper Mangelson in depth on the incriminating statements issue because he claims that he was informed by the government that it would not seek to admit those statements. Defendant therefore sought to bifurcate the issues and to continue the hearing with regard to voluntariness of the statements. No ruling was made as to that request. Rather, the matter was to be further discussed after the evidence which was available at the time was presented. The hearing proceeded on that basis. Later, the court informed counsel for defendant that she was to notify the court prior to any briefing if defendant desired another evidentiary hearing. No such notice was provided. In this regard, defendant's counsel told the court at the conclusion of the evidentiary hearing that she would notify the court if a further evidentiary hearing or oral argument was requested, otherwise, she would proceed to brief her motions based on the evidence presented. Transcript of July 29, 1997, Evidentiary Hearing, page 76. Defendant briefed the motions without requesting further hearings and therefore this court deems the matter submitted.

The court notes that the only evidence regarding the statements came from Trooper Mangelson. While *Miranda* and *Edwards* rules have clarity and are easy to apply, a proper determination under § 3501, based on the constitutional question of whether under all the circumstances the incriminating statements were voluntary and not compelled, inherently requires probing evidence into the context of the statements. Accordingly, this court *sua sponte* orders a further voluntariness evidentiary hearing, to be set at such time as defendant is apprehended and given an opportunity to testify. Sergeant Ellis, who did not earlier testify, and Trooper Mangelson, should be available to testify at that hearing.

Based upon the foregoing, it is hereby

ORDERED, that all of the motions to dismiss, to suppress and to strike, presented by defendant are DENIED; it is

FURTHER ORDERED, that defendant's motion to suppress the "off Miranda" statements is held in abeyance until a further evidentiary hearing may be conducted on that issue at such time as defendant is apprehended and available.